UNITED STATES of America,

v.

Michael BLOOME, a/k/a "Smurf," Joseph DeFigueroa, a/k/a "Mayo," Philip DeAngelo, Salvatore Fusco, a/k/a "Sally," Thomas Roberto, Richard Santiago, Frank Smith, a/k/a "Frankie," Angel Soto, Peter Spoto, Anthony Vega, Anthony Zappola, George Zappola, a/k/a "Little George," and Vincent Zappola, a/k/a "Vinnie," Defendants.

No. CR–90–0504.

United States District Court, E.D. New York.

Feb. 7, 1992.

Jack Wenik, Asst. U.S. Atty., Brooklyn, N.Y., for U.S.

Christopher Nalley, Staten Island, N.Y., for Michael Bloome.

Martin Adelman, New York City, for Salvatore Fusco.

Paul A. Lemole, Staten Island, N.Y., for Vincent Zappola.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Defendants Michael Bloome, Salvatore Fusco, and Vincent Zappola were convicted at trial on the first thirteen counts of a fourteen-count superseding indictment. After the jury verdict, each of these three defendants waived his right to trial by jury on the fourteenth count (for forfeiture under 18 U.S.C. § 1963(a)(3) of the proceeds of the racketeering activity of which the defendants were convicted in counts one and two). This court then found that the government had established beyond a reasonable doubt that the defendants were jointly and severally liable for $1,740,000.00 to be forfeited to the United States under count fourteen. *United States v. Bloome*, 777 F.Supp. 208 (E.D.N.Y.1991). These three defendants have now moved under Federal Rule of Criminal Procedure 29(c) that the court set aside the jury verdict on every count of the superseding indictment; the government opposes the defendants' motion. For the reasons set forth below, that motion is denied in its entirety.

## DISCUSSION

Federal Rule of Criminal Procedure 29(c) provides that a court, on the motion of a defendant after a guilty verdict, may "set aside the verdict and enter judgment of acquittal." The standards for review of a jury verdict (or for entering judgment of acquittal at the end of the government's case) are straightforward:

When a defendant moves for a judgment of acquittal, the Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If [it] concludes that upon the evidence there must be such a doubt in a reasonable mind, [it] must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If [it] concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [it] must let the jury decide the matter."

*United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972) (quoting *Curley v. United States*, 160 F.2d 229, 232–33 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947))). The defendants here attack the verdicts on the first thirteen counts of the superseding indictment (and, derivatively, the decision of this court as to the fourteenth count). Each argument is considered in turn.

1. *Counts One, Two, and Fourteen: The RICO Counts*

Counts one and two of the superseding indictment charged the defendants with violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and with conspiracy to violate RICO. Count fourteen is a count under 18 U.S.C. § 1963(a)(3) for the forfeiture of the proceeds of the racketeering activity of counts one and two. The defendants argue that the verdicts on these counts must be set aside because the government "failed to prove that the Racketeering Acts were related to each other and to the same enterprise." Memorandum of Defendants at 9. The defendants reason that one predicate-act burglary "was committed by a group of people (enterprise) that was unknown to and totally different from the group that committed" a second predicate-act burglary. *Id.* In other words, the defendants argue, because

the actual participants of the charged predicate acts may have differed from act to act, the government has failed to prove either the existence of an "enterprise" or any "relatedness" among the discrete instances of racketeering activity.

The defendants are entirely incorrect to suggest that, under RICO, different groups of persons committing different predicate acts necessarily constitute different enterprises. One enterprise may, as did the enterprise in this case, have different members at different moments in its existence. *United States v. Coonan*, 938 F.2d 1553, 1560 (2d Cir.1991) (affirming RICO conviction when, inter alia, membership of enterprise changed over time).

██ As a matter of establishing the "pattern" requirement of RICO, the government must demonstrate that the charged predicate racketeering acts are "related." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). As the Second Circuit has made clear, such "relatedness"—or "[a]n interrelationship between [predicate] acts"—"may be established in a number of ways." *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). Among these avenues of proof are:

> proof of ... temporal proximity, or common goals, or similarity of methods, or repetitions. [Furthermore,] [t]he degree to which these factors establish a pattern may depend on the degree of proximity, or any similarities in goals or methodology, or the number of repetitions.

*Id.* In this case, "relatedness" is readily demonstrated by the "temporal proximity, ... common goals, [and] similarity of methods" of the predicate acts: Within a period of three years, the defendants committed numerous sophisticated burglaries of commercial establishments. In all these burglaries, the members of this RICO enterprise employed similar modi operandi. As the indictment charged—and as the government demonstrated at trial:

> Typically, members of the [enterprise] would sever the telephone lines leading to the burglarized premises. Members would then make a hole in the roof of the establishment using a pick axe and once inside smash any alarm boxes. Other members of the [enterprise] would remain outside the premises, conducting surveillance for police while maintaining radio communications with those members ... inside the burglarized premises. Finally, members of the [enterprise] would seek out any safes in the burglarized premises and open them using a unique drilling method....

In short, the nature of the predicate acts—as well as the way in which they were committed and the time period within which they were committed—established the "relatedness" requirement of the "pattern" element of the RICO statute under *Indelicato*. Thus, the defendants' challenge to their guilty verdicts on the first and second counts of the superseding indictment necessarily fails; by extension, their challenge to count fourteen is also without merit.

### 2. *Counts Three and Six: 18 U.S.C. § 659*

Count three of the superseding indictment charged that the defendant Fusco violated 18 U.S.C. § 659 by possessing goods (with a value over $100.00) that he knew to be stolen and that had been a part of an interstate shipment. This count refers to Fusco's possession of certain jewelry stolen from the Jewelers of Bond Street in Nassau County, New York. Count six of the indictment charged that the defendants Bloome and Zappola violated 18 U.S.C. § 659 by stealing goods (with a value over $100.00) that were a part of an interstate shipment. This count refers to their theft of Bulova watches during a burglary of the Bulova Watch Company facility in Queens, New York. As to both these counts, the defendants contend that the jury verdicts should be set aside because the government failed to prove that the goods in question were a "part of an interstate shipment."

As a threshold matter, certain general observations about Section 659 are in order. First, there is a division of authorities on the question whether the "interstate

shipment" component of Section 659 is an element of the crime itself or is simply a jurisdictional prerequisite for trial in a federal court. *Compare United States v. Bizanowicz,* 745 F.2d 120, 122 (1st Cir.1984) ("interstate shipment" component an "essential element of the crime") *with United States v. Hankish,* 502 F.2d 71, 76 (4th Cir.1974) ("interstate shipment" component "simply a jurisdictional peg ... not ... an element of the criminal offense"). Regardless of the answer to this question, the defendants are correct in their argument that, if the government failed to demonstrate that the goods in counts three and six were "part of an interstate shipment", their convictions in this federal court must be set aside.

■ The leading case on Section 659 in this circuit, *United States v. Astolas,* 487 F.2d 275 (2d Cir.1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974), instructs that "Section 659 is designed by the Congress to promote the flow of goods in interstate commerce" and that "the carrying out of this purpose is not to be hampered by technical legal conceptions." *Id.* at 279. *See also United States v. Bryser,* 954 F.2d 79, 85 (2d Cir. 1992) ("This court has long interpreted § 659 as evincing Congress' intention to protect the integrity of interstate commerce and to prevent interference with the flow of that commerce."). Among the "technical legal conceptions" which are to be avoided in construing the scope of Section 659 is any notion that the goods in question must be actually *moving* in interstate commerce at the time they are stolen. *Astolas,* 487 F.2d at 279; *see also Bizanowicz,* 745 F.2d at 122 ("It is not necessary for the goods ... to be actually moving in interstate commerce at the time for an offense to lie under 18 U.S.C. § 659."). Rather, "the determination that a shipment is interstate is essentially a practical one based on common sense and administered on an ad hoc basis." *Astolas,* 487 F.2d at 279. Thus:

> [This determination] depends on such indicia of interstate commerce as the relationship of consignee, consignor, and carrier, if they are separate entities ...

the physical location of the goods when stolen ... whether the goods have been delivered to a carrier at the time of the theft ... where there is no carrier, what steps the owner has taken to carry out an interstate shipment ... and the certainty with which interstate shipment is contemplated, as evidenced by shipping documents.

*Id.* at 279–80. The court in *Bizanowicz* considered similar factors to be germane to the determination of whether particular goods constituted an interstate shipment. *Bizanowicz,* 745 F.2d at 122 (listing as factors: physical location of goods when stolen; whether goods had been delivered to carrier; whether owner had taken any measures to effect interstate shipment; and whether shipping documents indicated that shipment would occur). With these touchstones clearly in mind, the arguments of the defendants are readily adjudicated.

■ As to count three, Fusco argues that the jewelry stolen from the Jewelers of Bonds Street did not constitute part of an interstate shipment because: "there was no ... proof that the goods stolen were mailed to that store; quite the contrary, the goods were dropped off at the store to be mailed to the customer when the goods were repaired...." Memorandum of Defendants at 4. However, the president of the Jewelers of Bond Street, Gary Sanford, testified at trial that his company conducted a substantial portion of its business with customers located outside New York. He testified that the Jewelers of Bond Street would, about twice a week, ship jewelry (always of value exceeding $100.00) to customers outside the state; he testified that these shipments were made through the United States Postal Service. Sanford also stated that, often, jewelry that had been packaged and labeled for shipment would remain in his store overnight; such jewelry would be mailed the following day. He specifically testified that, as to the burglary of the Jewelers of Bond Street in July of 1985, some of the jewelry stolen had already been packaged and labeled for out-of-state shipment.

On the evidence adduced at trial, it is clear that the jewelry taken from the Jewelers of Bond Street constituted "part of an interstate shipment." Among the pieces taken, certain items had been packaged and had been labeled for interstate shipment; the packages were to have been taken to the post office the morning after the burglary. To hold that these items—for which all preshipment preparation had been completed—did not constitute part of an "interstate shipment" because they had been left at the jewelry store for the night would defeat the mandate of Astolas and of Bizanowicz that goods need not be "actually moving" in interstate commerce to constitute an interstate shipment. Such a holding would, in fact, frustrate the legislative intent to protect the integrity of interstate commerce by adherence to a rigid, formalistic understanding of "interstate shipment." For this reason, this court cannot set aside the verdict on count three of the superseding indictment.

On count six, the defendants again argue that the government failed to establish that the watches stolen from the Bulova Watch Company facility in Queens were part of an interstate shipment. They concede that the government demonstrated that the facility conducted all domestic operations of the Bulova Watch Company (such as inventory, storing, marketing, packaging, and shipping). Memorandum of Defendants at 2. Although the stolen watches were among approximately 68,000 watches that the Bulova Watch Company intended to ship to a customer in New Jersey within a few days of the burglary, the defendants maintain that the stolen watches "had not yet taken on the characteristics ... of an interstate shipment." Id. at 1–2. Specifically, the stolen watches had not yet been transferred from the general inventory records of the company to the "to-be-shipped" inventory records; the watches had not yet been packaged for shipment; they had not been labeled for shipment to New Jersey; and many of the watches were still in preshipment tote boxes. On the other hand, testimony from employees of the Bulova Watch Company established that between 80 and 85 percent of the sales orders handled by the burglarized Bulova facility were regularly shipped to destinations outside New York, that the sales order placed by the New Jersey customer had been memorialized in a contract, that some of the stolen watches were to have been used to fill the New Jersey shipment order, and that, accordingly, some of the stolen watches had already been physically separated from the general Bulova inventory of watches.

The defendants submit that United States v. Hardaway, 455 F.Supp. 226 (N.D.Ill.1978), aff'd, 593 F.2d 285 (7th Cir.), cert. denied, 441 U.S. 964, 99 S.Ct. 2413, 60 L.Ed.2d 1070 (1979), should control this case. There, the court found that, among other indicia of interstate commerce, the relevant goods had been stolen from a large mail-order establishment after the company had lost "its ability to cancel or intercept an outbound customer order." Id. at 233. The court determined that to hold that those goods did not constitute an interstate shipment simply because they had not yet been consigned to a carrier would be to frustrate the legislative purpose of Section 659 on the basis of a "technical legal concept." Id. It appears that the defendants here would have this court read Hardaway to stand for the proposition that the question of whether particular goods constitute an "interstate shipment" turns on whether or not the owner of those goods has "irretrievably placed [them] into [the] stream" of interstate commerce. Memorandum of Defendants at 3.

Although this court does not doubt the integrity of the Hardaway decision, it declines the invitation of the defendants to construe that opinion as providing the algorithm for every application of Section 659. Rather, this court follows the mandate of the Second Circuit that the Section 659 judgment is "essentially a practical one based on common sense and administered on an ad hoc basis." Astolas, 487 F.2d at 279. In this regard, it is significant that the New Jersey order was a "firm" order that had been reduced to a contract. Furthermore, the employees of the Bulova Watch Company had already begun to sep-

arate the watches destined for New Jersey from the other watches at the facility. In other words, the watches stolen in the Bulova burglary had already been effectively designated as inevitably bound for shipment to New Jersey.

Far closer to the factual configuration of this case than *Hardaway* is the opinion of the First Circuit in *Bizanowicz*. There, the defendant stole candy from a manufacturer which transported its goods from its factory in Cambridge, Massachusetts to its warehouse in Chelsea, Massachusetts. From Chelsea, the candy would have been sent to destinations "throughout the United States." *Bizanowicz*, 745 F.2d at 121. In fact, over 90 percent of the candy manufactured in Cambridge was regularly sold and shipped to out-of-state locations. Moreover, bills of lading had already been prepared for the stolen candy at the Chelsea warehouse, and some of the candies were "special order" items made for out-of-state customers. The defendant argued, however, that because he stole the candy during the *intrastate* transportation of the candy from Cambridge to Chelsea, it had not yet "acquired an interstate flavor." *Id.* at 122. The court disagreed with the defendant: It held that the candy was part of an "interstate shipment" within the meaning of Section 659 because bills of lading had already been prepared for the candy, because some of the candy had been specially made for out-of-state customers, and because there was nothing to suggest that "at least 90% ... of the stolen goods were not *destined* for out of state delivery in accordance with normal practices." *Id.* (emphasis added).

Similarly, the watches in this case were clearly "destined" for "out of state delivery" pursuant both to "normal practices" and to the firm sales order placed by the New Jersey customer. Also, many of the watches to be shipped were of unique design—and they had been specifically requested by the New Jersey customer. That bills of lading had not yet been prepared for the watches in this case as they had been for the candy in *Bizanowicz* does not furnish an adequate basis for distinction; indeed, such a distinction would con-

stitute precisely the type of "technical legal concept" about which *Astolas* cautions. In this case, the written contract between Bulova and its New Jersey customer for the sale and shipment of the watches stolen by the defendants is as clear an index of interstate commerce as were the bills of lading in *Bizanowicz*. Furthermore, in both this case and in *Bizanowicz*, the high percentage of out-of-state business conducted by the commercial establishments from which the goods were stolen virtually compels the conclusion that a theft of finished goods from those businesses is a theft of goods that are "destined for out of state delivery." Protection of the integrity of the business done by just such firms is precisely the legislative objective that informs Section 659. On these factors, the "interstate shipment" character of these stolen watches could not be more plain.

### 3. *Count Four: 18 U.S.C. § 2312*

■ Count four charged that the defendants Bloome and Zappola violated 18 U.S.C. § 2312 by transporting in interstate commerce a motor vehicle that they knew to be stolen. The "motor vehicle" to which count four refers was a truck stolen from the Bulova Watch facility as a part of the defendants' burglary of that facility. The defendants contend that "there was insufficient evidence [at trial] to prove that each or [either] of these defendants transported or substantially assisted in the transportation of the stolen ... truck across a state line...." Memorandum of Defendants at 7.

However, by their own contention ("there was insufficient evidence to prove that ... these defendants ... *substantially* assisted ..."), the defendants concede that there was evidence that they did in fact participate in the transportation of the stolen truck across state lines. Furthermore, at trial, Angel Soto, a coconspirator in the Bulova Watch Company burglary, testified that both Bloome and Zappola participated in that burglary and in the theft of the truck. The defendants do not dispute that this truck—which they helped to steal—was later transported from New

York into New Jersey. On this basis, there was clearly adequate evidence for a jury to infer that Bloome and Zappola had violated Section 2312—either as principals or as aiders and abettors. Because there was sufficient evidence for this verdict, then, this court will not set it aside.

### 4. Counts Five, Eight, Nine, and Twelve: 18 U.S.C. § 2314

Count five of the superseding indictment charged that the defendants Bloome and Zappola violated 18 U.S.C. § 2314 by transporting in interstate commerce stolen goods with a value of $5,000.00 or more: Specifically, they were charged with having transported from New York to Pennsylvania certain Bulova watches stolen from the Bulova Watch Company facility. Counts eight and nine charged that the defendants Bloome, Fusco, and Zappola violated Section 2314 by transporting in interstate commerce stolen cash in the amount of $5,000.00 or more: Specifically they were charged with having transported approximately $85,000.00 in cash stolen from a Bradlees department store in New Jersey into New York and with having transported the same stolen funds from New York to Florida. Finally, count twelve charged that Bloome, Fusco, and Zappola conspired to violate Section 2314: Specifically, they were charged with conspiracy to transport in excess of $5,000.00 in interstate commerce after the burglary of a K–Mart department store in New Jersey. The defendants attack the sufficiency of the evidence adduced to prove these counts.

■ As to count five, there was clearly evidence from which the jury could infer that the defendants had participated in the transportation of the stolen Bulova watches to Pennsylvania. As a threshold matter, they do not attack the adequacy of the evidence on which the jury found that they had participated in the burglary of the Bulova Watch Company facility and in the theft of Bulova watches from that facility. Furthermore, accomplices of the defendants testified that the burglary participants had discussed sending the watches to Pennsylvania. In fact, such watches—including watches of unique design—were found in Pennsylvania shortly after the Bulova Watch facility burglary; some of the recovered watches were still in tote boxes such as those used at the Bulova facility. From this evidence, a jury could have reasonably inferred that the watches found in Pennsylvania were indeed those taken by the defendants from the factory in New York; on this basis, the jury could also have concluded that the defendants had participated in the interstate transportation of those stolen goods.

■ As to count eight of the superseding indictment, Dominick Costa testified that he had participated in the burglary of the Bradlees department store with the defendants and that, together, they transported cash well in excess of $5,000.00 from the site of the burglary in New Jersey to New York. As to count nine, Costa testified that he and the defendants went to Florida after this burglary and that he took with him $10,000.00 of the stolen money. Similarly, the principal evidence on count twelve was the testimony of Dominick Costa. The defendants contend that the "uncorroborated" testimony of Costa constituted an inadequate basis on which to predicate a verdict of guilt on these counts.

However, even if this testimony from Costa were entirely uncorroborated (it was in fact corroborated on several points), it would nonetheless be adequate evidence on which to base a conviction. As stated by the court in *United States v. Parker*, 903 F.2d 91, 97 (2d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990):

> The fact that a conviction may be supported only by the uncorroborated testimony of a single accomplice is not a basis for reversal if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.

*Accord: United States v. Mejia,* 909 F.2d 242, 245 (7th Cir.1990) (Testimony of accomplice is sufficient evidence for conviction unless it is "inherently unbelievable" or "contradict[s] the laws of nature or other indisputably true evidence."); *United States v. Drews,* 877 F.2d 10, 12 (8th Cir.

1989) ("Accomplice testimony is sufficient to support a conviction when it is not incredible or insubstantial on its face."); *United States v. Elusma*, 849 F.2d 76, 79 (2d Cir.1988), *cert. denied*, 489 U.S. 1097, 109 S.Ct. 1570, 103 L.Ed.2d 936 (1989) ("An accomplice's testimony ... need not be corroborated to establish guilt."); *United States v. Vaccaro*, 816 F.2d 443, 455 (9th Cir.), *cert. denied*, 484 U.S. 914, 928, 108 S.Ct. 262, 295, 98 L.Ed.2d 220, 255 (1987) ("[T]he testimony of an accomplice, if believed, is sufficient to sustain a conviction."). The credibility of Costa's testimony was a question solely for the consideration of the jury. *Mejia*, 909 F.2d at 245 ("Credibility is for the jury, not this court, to determine."); *Parker*, 903 F.2d at 97 (The court "must defer to the jury's assessments of both the weight of the evidence and the credibility of the witnesses...."); *Vaccaro*, 816 F.2d at 455 ("Witness credibility ... is a question for the jury that is not reviewable.").

Because Dominick Costa, an accomplice of the defendants, testified as to the defendants' violations of Section 2314, and because his testimony was not "incredible on its face," the defendants' argument that the guilty verdict on counts eight, nine, and twelve should be set aside is entirely without merit.

### 5. *Counts Seven, Ten, and Eleven: 18 U.S.C. § 2113(a)*

Count seven of the superseding indictment charged that the defendant Fusco violated 18 U.S.C. § 2113(a) by entering the Atlantic Liberty Savings Bank ("ALSB") with intent to commit a felony affecting the bank (that is, with intent to steal property or money worth over $100.00 from the bank). Count ten charges that the defendants Bloome, Fusco, and Zappola violated 18 U.S.C. § 2113(a) by entering the European American Bank with intent to commit a felony affecting the bank (that is, with intent to steal property or money worth over $100.00 from the bank). Count eleven charges that the defendant Fusco conspired to violate 18 U.S.C. § 2113(a) by entering the First Nationwide Savings Bank ("FNSB") with intent to commit a felony

affecting the bank (that is, with intent to steal property or money worth over $100.00 from the bank). As to all these counts, the defendants contend that "the evidence ... consisted solely of Dominick Costa's testimony and was therefore insufficient to sustain the jury's verdict." Memorandum of Defendants at 8.

As demonstrated above, even the uncorroborated testimony of an accomplice in a crime is sufficient to support a verdict of guilt if that testimony is not "incredible on its face." *Parker*, 903 F.2d at 97. But the defendants have not endeavored to suggest to this court how Costa's testimony is "incredible" or why it is otherwise "insufficient." This court heard Dominick Costa testify, and the court concluded at that time that he had testified "in a coherent and forthright manner." *United States v. Bloome*, 773 F.Supp. 545, 547 (E.D.N.Y. 1991). This court knows of no reason—nor do the defendants suggest any—why the jury should not have been entitled to weigh Costa's testimony, to determine for itself the credibility of his account, and to reach a verdict that either embraced or rejected his evidence.

As to count eleven, the defendant Fusco also argues that the evidence at trial did not establish a conspiracy to commit a burglary of the FNSB. He argues that the government failed to show any agreement "express or implied" by Fusco and Costa to burglarize the bank; rather, he contends: "[T]he evidence showed a unilateral act by the defendant Fusco with no agreement or even tacit acknowledgment by Costa to do anything. Costa was simply a witness to the acts of Fusco at the bank." Memorandum of Defendants at 8.

Once again, the defendant advances a meritless position. Costa testified that he and Fusco entered the bank together. While there, Fusco procured the use of a safe deposit box (under an assumed name); but the purpose of the visit to the bank, Costa testified, was for Costa to reconnoiter the general security at the bank and for Fusco to survey the safe deposit boxes. From this, the jury was more than reason-

able to infer that there was an agreement, either explicit or implicit, between Costa and Fusco to burglarize the bank. *See, e.g., Mariani,* 725 F.2d at 865–66 ("Conspiracy can be proven circumstantially; direct evidence is not crucial.... Seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.") (citations omitted). On this basis, this court cannot set aside the verdict of the jury.

Finally, as to count seven, Zappola argues that, because he was previously acquitted of charges that he participated in the burglary of the ALSB (he was convicted on charges of conspiracy to commit that burglary), the government was barred under the Double Jeopardy Clause of the federal Constitution from offering against him evidence of his participation in that crime. His argument is grounded in *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). There, the Supreme Court specifically held that:

> [T]he Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted.

*Id.* 110 S.Ct. at 2087. Although, Zappola is not named in count seven of the superseding indictment, and although evidence about his involvement in the ALSB burglary was not offered against him for purposes of establishing his guilt on a Section 2113(a) count in this trial, the evidence of his role in the burglary was offered to show the existence of the RICO enterprise of which Zappola was alleged to be a member. In other words, Zappola argues that certain conduct by him (that is, his conduct in the ALSB burglary) that constituted an offense for which he had already been prosecuted (as a substantive Section 2113(a) violation) was proven at this subsequent trial for the purpose of showing an essential element (the RICO enterprise) of the offense charged in counts one and two of the superseding indictment. Thus, he

reasons, the sweeping language of *Grady* should have precluded the use of that evidence against him on the RICO counts.

However, *Grady* has been read by the courts of appeals less expansively than its own broad language might suggest. At least three circuits have held that *Grady* applies only to "single event" crimes; as such, they have determined that *Grady* is inapposite to double jeopardy analysis in RICO prosecutions. Those circuits have continued to apply *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), to double jeopardy claims in RICO cases; thus, they have held that double jeopardy does not bar a RICO prosecution that alleges as a predicate act a crime for which the defendant was previously prosecuted. *See United States v. Arnoldt,* 947 F.2d 1120, 1126 (4th Cir.1991) ("We believe the principles enunciated in *Grady* govern the paradigmatic 'single course of conduct' case, but that prosecutions under statutes such as RICO ...— statutes targeted at 'multilayered' instances of criminal conduct invariably occurring at different places and times—call for a calculus reflecting the concerns expressed in *Garrett.*"); *United States v. LeQuire,* 943 F.2d 1554, 1559 (11th Cir.1991) ("[T]he rationale of *Garrett* is more appropriate than *Grady* in RICO situations.... *Grady* ... is more applicable in single offense situations...."); *United States v. Pungitore,* 910 F.2d 1084, 1110 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2009–11, 114 L.Ed.2d 98 (1991) ("The double jeopardy analysis in ... *Grady* ... cannot easily be transposed to the RICO context.... Instead, we consider the double jeopardy problem posed by the successive prosecutions [in a RICO case] to be more closely analogous to that in [*Garrett*]....").

However, this practice—by which the courts of appeals have analyzed double jeopardy claims for "single event" cases under *Grady* and double jeopardy claims for RICO cases under *Garrett*—has not been expressly adopted by the Second Circuit. Indeed, in the dicta of one case that did not involve a RICO count, the court stated that *Grady* applied, by its own terms, to "all double jeopardy claims aris-

ing in the context of successive prosecutions." *United States v. Calderone*, 917 F.2d 717, 721 (2d Cir.1990). It is not clear, however, what force this passage from *Calderone* has in the context of a RICO prosecution: Not only did *Calderone* involve crimes other than RICO, but the panel in that case did not even mention *Garrett*—the case that the other circuits have determined to be better suited to double jeopardy claims in RICO cases and a case that the Supreme Court specifically cited (without questioning or overruling) in *Grady*. Hence, unlike the decisions from other courts of appeals that have evaluated *Grady* in an attempt to coordinate it with *Garrett*, *Calderone* leaves entirely unclear what continued application *Garrett* is to have in double jeopardy analysis. *Compare: United States v. Scarpa*, 913 F.2d 993, 1013–14 n. 8 (2d Cir.1990) (recognizing continued vitality of *Garrett* after *Grady*).

Furthermore, Second Circuit cases subsequent to *Calderone* have cast some doubt on the significance of its construction of *Grady*—particularly as it relates to *Garrett*. *See, e.g., United States v. Giovanelli*, 945 F.2d 479, 492 (2d Cir.1991) (recognizing that "single event" crimes and "multilayered conduct" crimes merit separate double jeopardy analyses); *United States v. Coonan*, 938 F.2d 1553, 1563 (2d Cir. 1990) (citing pre-*Grady* cases from Second Circuit); *United States v. Gambino*, 920 F.2d 1108, 1113 (2d Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991) (recognizing continued vitality of *Garrett* after *Grady* and citing *Pungitore*). Along those same lines, no other double jeopardy case in this circuit has referred to the split decision of *Calderone* for the proposition that *Grady* controls *all* double jeopardy claims. Thus, despite the broad language of *Calderone*—language even broader than that of *Grady* itself—the Second Circuit has explicitly confirmed that *Garrett* survives *Grady*, and the court has implicitly recognized that *Garrett* may be a better tool than *Grady* for double jeopardy analysis in RICO cases.

This court is satisfied that, under a *Garrett* analysis, the introduction at this RICO trial of evidence concerning Zappola's role in the ALSB burglary in order to demonstrate the "enterprise" element of the RICO counts did not violate double jeopardy. The circuit courts have consistently read *Garrett* for the proposition that double jeopardy does not bar successive prosecutions for an act that constitutes both an independent substantive offense and a predicate act offense under RICO. *See, e.g., Arnoldt*, 947 F.2d at 1126–27. Indeed, those courts have applied *Garrett* in this manner even when—as in this case—the racketeering activity in question did not continue beyond the date of the first prosecution. *See id.* at 1126 n. 7. If the successive prosecutions of particular events both as substantive offenses and as predicate acts under RICO do not offend double jeopardy, a fortiori the introduction of testimony about an already prosecuted substantive offense as mere evidence of the enterprise element of RICO likewise does not ran afoul of that constitutional bar. *See, e.g., Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (introduction of testimony about previously prosecuted burglary as evidence of identity of burglar in bank robbery prosecution was not barred by double jeopardy).

Furthermore, even if *Grady* does control the analysis of this case, the introduction of this evidence against Zappola still withstands double jeopardy scrutiny. First, it is important to note that, on at least one possible construction of *Grady*, the conduct involved in a violation of Section 2113(a) and the conduct involved in a violation of RICO are not necessarily congruent. In the first case, the relevant "conduct" of Zappola was his endeavor to commit a felony affecting the ALSB; in the second case, the relevant "conduct" of Zappola was his participation in an enterprise that engaged in a pattern of racketeering activity. *See, e.g., United States v. Gonzalez*, 921 F.2d 1530, 1538 (11th Cir.), *cert. denied*, —— U.S. —— and ——, 112 S.Ct. 96 and 178, 116 L.Ed.2d 68 and 140 (1991) (distinguishing conduct involved in importation and distribution of contraband from conduct involved in RICO conspiracy for purposes of *Grady v. Corbin*). Indeed, *Grady* specifically re-

jected both a "same evidence" and a "same transaction" test—either of which would more closely circumscribe the standards for determining the relevant "conduct." *See Grady*, 110 S.Ct. at 2093 and at 2094 n. 15. Thus, it is not altogether clear that *Grady* operates to foreclose the introduction of this evidence for the purpose of demonstrating Zappola's participation in the RICO enterprise.

Secondly, it appears also that the circumstances of this case—the offering of this evidence against Zappola to support the "enterprise" element of RICO—may well fall outside the intended scope of *Grady*. A carefully reasoned concurring opinion by Judge Newman in *Calderone* attempts to delineate more clearly the "element" component of the *Grady* test. Judge Newman points out that, as Justice Scalia had remarked in dissent in *Grady:* "*All* evidence pertaining to guilt seeks 'to establish an essential element of [the] offense,' and should be excluded if it does not have that tendency." *Grady*, 110 S.Ct. at 2103. Thus, Judge Newman observes, a broad reading of the "element" component of *Grady* would threaten any meaningful boundary to the *Grady* test. Rather:

> I think we are obliged to apply *Grady* in a way that gives the "element" component significance. That means barring the second prosecution only when the conduct previously prosecuted is to be used to "establish" the element of the second crime, which I think must mean "constitute the entirety of" the element. If *Grady* is read more broadly, that is, if the second prosecution is barred whenever the previously prosecuted conduct is to be used only *as evidence of* an element of the second offense, then we would almost be applying a "same evidence" test. Instead, I think it more likely that the Supreme Court expected *Grady* to apply only when the conduct prosecuted at the first trial is or may constitute the entirety of an element of the offense at the second trial.

*Calderone*, 917 F.2d at 724. Not only does this reading render the "element" segment of *Grady* more meaningful, it also, as Judge Newman argues, reconciles *Grady* with *Dowling*—a task thought to be problematic by the *Grady* dissenters.

This court is persuaded by Judge Newman that the words "to establish an element" in *Grady* signify "constitute the entirety of an element." Thus, if indeed *Grady* applies to the double jeopardy analysis in a RICO case such as this one, the analysis must be as follows: Although Zappola's conduct in the ALSB burglary was introduced at this trial *"as evidence of"* his participation in the charged enterprise and although "enterprise" is an element of a RICO offense, Zappola's conduct was not introduced "to establish" the enterprise element because that conduct did not—and could not—"constitute the entirety of [the enterprise] element." Indeed, at trial the government introduced substantial additional evidence of the existence of the charged enterprise and of Zappola's participation in that enterprise; as such, the matters concerning his role in the bank burglary were not by any means dispositive of the enterprise element of the RICO counts. Hence, either under *Garrett* or under *Grady*, the double jeopardy claim of the defendant Zappola proves to be meritless.

### 6. *Count Thirteen: 18 U.S.C. § 1512*

■ Count thirteen of the superseding indictment charged that the defendants Bloome and Fusco, in violation of 18 U.S.C. § 1512, attempted to kill Dominick Costa with the intent to prevent him from communicating to a federal law enforcement officer information about the commission of federal crimes. The defendants tersely contend that: "[T]he evidence ... on this [c]ount ... was insufficient to sustain the jury's verdict. The evidence was insufficient, contradictory and incredible as a matter of law." Memorandum of Defendants at 9.

Although one might have hoped for a fuller account of the defendants' position, the conclusory statements advanced in lieu of an argument are adequate to reveal the lack of merit on this point. At trial, the government adduced on count thirteen the testimony of Dominick Costa as well as the testimony of Dorothy Lazar (a corroborat-

ing eyewitness). This court attended carefully to the testimony of those witnesses and did not find it at all to be "insufficient, contradictory [or] incredible as a matter of law." The defendants' motion to set aside the verdict on count thirteen is therefore denied.

## CONCLUSION

For the reasons indicated above, the motion of the defendants to set aside the guilty verdicts on all counts and to enter a judgment of acquittal is denied in all respects.

SO ORDERED.